PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 08-1903 & 08-1909

UNITED STATES OF AMERICA,
                                        Appellant

v.

FREDERICK S. SCHIFF

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 2-06-cr-00406-001)
District Judge: Honorable Faith S. Hochberg

Argued May 11, 2009

Before: AMBRO, ROTH and ALARCÓN[*], Circuit Judges

[*]Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

(Opinion filed: April 7, 2010)

Paul J. Fishman
   United States Attorney
Ralph J. Marra, Jr.
   Acting United States Attorney
George S. Leone (Argued)
   Chief, Appeals Division
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ   07102-0000

      Counsel for Appellant

Steven R. Glaser, Esquire
Lawrence S. Spiegel, Esquire
David M. Zornow, Esquire (Argued)
Skadden, Arps, Slate, Meagher & Flom
Four Times Square
New York, NY   10036-0000

      Counsel for Appellee

Roberto M. Braceras, Esquire
Goodwin Procter
53 State Street, Exchange Place
Boston, MA  02109-0000

Richard M. Strassberg, Esquire
Maria Amelia Calaf, Esquire
Goodwin Procter

620 Eighth Avenue
The New York Times Building
New York, NY   10018-1405

Counsel for Amicus Appellee

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Frederick Schiff and Richard Lane were high-ranking corporate executives at the pharmaceutical giant Bristol-Myers Squibb ("Bristol").  They were criminally indicted for allegedly orchestrating a massive securities fraud scheme related to Bristol's wholesale pharmaceutical distribution channels in the early 2000s, in violation of, *inter alia*, 15 U.S.C. § 78j(b) and Securities and Exchange Commission ("SEC") Rule 10b-5. The Government filed this interlocutory appeal in response to the District Court's March 19, 2008 opinion that addressed several contested theories of liability as well as expert witness issues under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).[1]  On appeal are two issues: (1) whether the District

---

[1]The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  This unusual pretrial interlocutory appeal, filed less than one week before Schiff's scheduled trial, was approved by

Court properly dismissed the Government's theories of omission liability under Rule 10b-5 that attempted to hold Schiff accountable for omissions in quarterly SEC 10-Q filings based on his and Lane's alleged misstatements in Bristol's quarterly conference calls; and (2) whether the District Court abused its discretion in excluding the Government's expert, following a *Daubert* hearing, who would have testified to Bristol's stock price drop as evidence of Rule 10b-5's materiality element. Because we agree that the Government's omission liability theories are not viable, we affirm the District Court's dismissal of these theories. As to the expert testimony, we conclude that the District Court's ruling excluding the Government's materiality expert was not an abuse of discretion.

## I.     Background

The criminal charges against the defendants stem from the Government's allegations that Schiff and Lane's statements to the investing public, in, among other things, public analyst conference calls and alleged omissions in SEC filings were misleading.   Bristol is a public corporation and leading manufacturer of pharmaceuticals and health care products. Schiff was promoted to Bristol's Chief Financial Officer ("CFO") from Controller in April 2001.  He left the company in mid-April 2002.  As CFO, he had primary responsibility for

the Acting Solicitor General, and we exercise appellate jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

4

Bristol's SEC filings (and signed those filings). Lane was President of Bristol's Worldwide Medicines Group, and left the company in early-April 2002. Both Schiff and Lane represented Bristol on quarterly public conference calls with Wall Street analysts.

Bristol's primary sales and distribution channel for its pharmaceutical products is through wholesalers, who, in turn, supply pharmacies, hospitals, and other health care providers. The wholesalers buy and maintain an inventory, typically based on projected "prescription demand" (*i.e.*, customers' demand for the products). They generally try to target their purchases to this demand projection, and not in excess of it, because more inventory results in higher carrying costs. If wholesalers purchase in excess of demand, it also affects Bristol by reducing the company's later sales while its wholesalers "work down" excess inventory to normal demand levels before purchasing more product.

From 2000 through 2001, Bristol implemented a sales strategy that underlays this case. The Company gave its wholesalers financial incentives, amounting to tens of millions of dollars each quarter, purportedly to spur them to buy its products in excess of prescription demand projections. For example, in August 2001 Schiff and Lane approved $47 million in sales incentives for the third quarter, and in November 2001 Lane approved $85 million in sales incentives for the fourth quarter. These incentives allegedly covered the wholesalers'

carrying costs and guaranteed return on their investment until they sold the products. The Government characterizes this as a deceptive strategy to increase sales and earnings in the short term to meet Bristol's aggressive sales and earnings targets,[2] and, in turn, artificially inflate the stock price.[3]

To conceal these practices from Bristol's shareholders and potential investors, Schiff and Lane allegedly "made materially false and misleading statements and omissions of material fact in analyst conference calls, press releases, and meetings with investors."[4] (Gov't Br. at 6.) The analyst calls

---

[2]According to the indictment, Bristol's sales targets were to double its 1994 sales by the end of 2000, and double its 2000 sales by the end of 2005.

[3]Defendants contend to the contrary that this practice was a business strategy for "selling ahead of demand," which is common in the pharmaceutical industry. (*See* Lane Br. at 7 (stating that "wholesalers purchased large amounts of drugs and increased their inventory as part of their own independent business strategy [to buy ahead of anticipated price increases] and not, as the Government alleges, because [Bristol] 'forced' them to take on the additional product").)

[4]In the indictment, the Government estimates that, based on drop in price per share times the number of outstanding shares, the securities fraud resulted in a market capitalization loss of $10.7 billion of stock. Defendants dispute this number.

are pertinent to the Government's omission liability theories that are a part of this appeal. The first analyst call Schiff participated in was on April 25, 2001, after he was promoted to CFO (whereas Lane was involved in analyst calls dating back to 2000). A sampling of the actionable statements made by Schiff and Lane in analyst calls include:

4/25/01    Schiff – "We look at, very closely, the wholesaler stocking inventories . . . . [T]here are no unusual items that we see in the inventory levels." (App. 73 (first quarter – Schiff and Lane on call));

7/25/01    Schiff – "we don't see anything unusual" in the "wholesaler inventories" (App. 73 (second quarter – Schiff and Lane on call))

Lane – when asked whether there were inventory issues, he responded "no" (App. 500–02);

10/23/01    Schiff – inventory was "up a couple of weeks" and expected "to be lower in the fourth quarter" (App. 74–75 (third quarter – Schiff and Lane on call)); and

7

12/13/01    Schiff – "We don't see any significant changes" in the prior call's statements that "inventory levels are slightly higher" and "would be reduced by the end of the year" (App. 75 (outside of quarterly call cycle, Schiff and Lane on call)).

On April 1, 2002, Bristol issued its 10-K for the 2001 fiscal year. The report discussed, among other things, excess inventory levels held by wholesalers:

[T]he Company believes average wholesaler inventories of products in the U.S. increased during 2001 by approximately four weeks of additional sales. The Company believes current inventories of its products held by wholesalers in the U.S. significantly exceed levels the Company considers desirable on a going-forward basis. The Company is in the process of developing a plan to reduce these wholesaler inventory levels. The Company expects this reduction in wholesaler inventories to lower levels will negatively impact its financial results in future periods. The Company will make further disclosure later in April 2002 about the plans it is developing to reduce wholesaler inventory levels and the

> Company's expectations with respect to the likely impact on its financial results.

(App. 200–01.) On the next trading day, the stock price dropped 5.3%, from $40.40 to $38.24.

On April 3, 2002, at the close of the trading day, Bristol made an additional announcement in an analyst call[5] (outside of the quarterly cycle) and a press release. Bristol's CEO Peter Dolan announced:

> Rick Lane will be leaving the Company.[6] . . .
>
> . . . .
>
> We've estimated that current wholesaler inventory levels significantly exceed the level that we consider desirable. As a result of my review, we're moving as aggressively as possible to

---

[5]The Bristol executives that participated in the call included: Schiff; Peter Dolan, Chairman and CEO; and Don Hayden, another senior executive.

[6]Bristol's April 3, 2002 press release indicated that Lane was leaving the company because "management changes are clearly necessary in light of the company's recent financial performance," and "[o]ne aspect of this performance" was "inventory management." (App. 307.)

reduce shipments to wholesalers, so that wholesaler inventory levels will be more consistent with demand. We estimate that this action will reduce earnings per share by approximately 35 to 40 cents over the full time period of the reduction process.

. . . .

Now, let me move to the full year 2002. Before the impact of reductions in wholesaler inventories and any non-recurring items, we estimate the full year 2002 earnings per share to be down between 25 and 30%. We expect sales to decline in the low single-digit range. That's a primary driver, as our previous guidance expected sales to increase in the mid to upper single-digit range.

. . . [W]e've identified several products in U.S. primary care that will not meet our sales estimates. Our original guidance to you for the Glucophage franchise, for example, was 1.2 to 1.4 billion for the year. Our analysis post-generic launch shows the franchise will not meet those estimates. And in particular, sales for Glucophage IR will decline more than 90% of 2001 sales.

10

Additionally, based on our demand-based modeling, sales for Avandia, Serzone, and Tequin will not meet our original estimates and likely decline in 2002 as compared to sales in 2001.

. . . .

. . . [O]n timing of inventory, our intention is to work it down as aggressively as we possibly can over as rapid a timetable as feasible. As you know, we don't own that wholesaler inventory.

. . . .

[Schiff (on excess inventory numbers):] [T]hat's around 800 million to $1 billion. . . . We will work, as we say, as aggressively as possible to reduce the inventory. And in order to do that, we have to slow down our shipments to the wholesalers.

. . . .

[Schiff:] Glucophage[,] . . . Avandia, Serzone, Tequin – are the key products that are lower that really make up that revenue reduction. That revenue that we're seeing is causing the result to get to [ ] 25 to 30% lower.

(App. 202–07.) Dolan also indicated that the "prior sales estimates" were "dramatically off track." (App. 203–06.) On the next trading day, April 4, Bristol's stock price dropped 14.7%, from $37.70 to $32.15.

On April 25, 2002 Bristol had its first quarter analyst call. It discussed, among other things, the inventory issue and loss of exclusivity on certain products from generic competition. On April 26, the stock price dropped 1.9%, from $29.89 to $29.32.

## B.    Procedural History

The pretrial history in this case is long and complex, but it is important to wade through it because of waiver issues raised by Schiff on appeal.[7] In June 2005, a grand jury returned a two-

---

[7]We note that the criminal prosecutions of Schiff and Lane do not stand alone. The SEC filed a civil enforcement action against them, which has been administratively terminated pending the outcome of their criminal cases. Bristol settled a related SEC civil enforcement action and entered into a deferred prosecution agreement, which effectively put the company on probation for two years and required it to pay a fine. Additionally, as is not uncommon in SEC enforcement actions, a follow-on private civil suit was filed in the Southern District of New York against Bristol, Lane, Schiff, and others, alleging, among other things, accounting fraud through improper revenue recognition. The case was dismissed by that Court on a Federal Rule of Civil Procedure 12(b)(6) motion. *In re Bristol-Myers*

count indictment against Schiff and Lane, charging them with: (1) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, contrary to 15 U.S.C. § 78j(b) ("Section 10(b)" of the Securities Exchange Act of 1934) & ff (penalties) and SEC Rule 10b-5(a)–(c) (17 C.F.R. § 240.10b-5); and (2) securities fraud, principally in violation of Rule 10b-5, and aiding and abetting in violation of 18 U.S.C. § 2.

The first indictment was dismissed because of a grand jury leak. A second indictment was returned in May 2006. Thereafter, in April 2007 the current indictment, labeled Third Superseding Indictment, was returned on the same two counts. This indictment omitted all allegations concerning accounting improprieties in Bristol's SEC filings (*e.g.*, the Government removed references to alleged corporate reserve manipulations and violations of Generally Accepted Accounting Principles in SEC filings). In November 2007, the District Court severed Schiff and Lane's trials. Schiff agreed to be tried first, and is the appellee before us.

Through multiple letters, briefs, amendments, stipulations, hearings, and court opinions during pretrial proceedings, the indictment and predicate legal theories were narrowed and sharpened. *See United States v. Schiff*, 538 F. Supp. 2d 818, 828–29 (D.N.J. 2008) (explaining that because of the constraints in the Stipulation, the Government could not

---

*Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004).

premise omission liability on the "falsity of reported sales and earnings," "nor [could] it rest on the mere recitation of the SEC filings' numbers on the analyst calls, because that is essentially the same as the SEC figures themselves"). For example, the Government filed a Bill of Particulars on November 20, 2007 listing the statements it intended to identify as false and attribute to Schiff and Lane. These were statements made in analyst calls, and none was from SEC filings. The Bill of Particulars expressly stated that the SEC filings "contain[ed] omissions of material fact" and not affirmative misleading statements. Additionally, in a January 2008 conference call with the Court and the defendants, the Government confirmed that it was not relying on a statutory duty as a theory of omission liability under Rule 10b-5.

Schiff and Lane filed motions to dismiss portions of the indictment.[8] On February 26, 2008, the District Court held a hearing on several pending motions, including the motions to dismiss. At the hearing, the Court ruled that it was denying the theory of fiduciary duty as a basis for omission liability.[9] On March 11, 2008, it conducted a *Daubert* hearing on expert

---

[8]Schiff initially filed an evidentiary motion *in limine*, which the Court correctly treated as a motion to dismiss.

[9]In the District Court's March 19, 2008 opinion, it reaffirmed that it had dismissed the fiduciary theory as a basis for a duty to disclose. *Schiff*, 538 F. Supp. 2d at 826 n.6.

14

issues.

The District Court's March 19, 2008 opinion (the "Opinion") covered much ground. *Schiff*, 538 F. Supp. 2d 818. Pertinent to this appeal, it dealt with the Government's omission theories of liability and the *Daubert* expert issue on the Rule 10b-5 element of materiality (which we will address separately in the *Daubert* section below). The Court explained that, despite its ruling dismissing several theories of liability, the case "will still go forward on legal theories related to alleged conspiracy, misstatements and omissions on analyst calls and misstatements listed under the heading 'Other' in the Bill of Particulars, scheme/business practice liability under Rule 10b-5(a) and (c), and aiding and abetting violations of Section 10(b)." *Id.* at 831.

It examined whether Schiff had a duty to speak in the SEC filings under Rule 10b-5(b). *See id.* ("Absent a duty to speak, there is no 'omission to speak' liability."). It dismissed theories of omission liability[10] and criticized the Government for

_____

[10]The District Court dismissed both a "theory of duty based on 'falsity of reported sales and earnings' in the SEC filings," which the Government is not appealing, and a "revised theory," labeled "all of a piece" (discussed below), which it is appealing. *See Schiff*, 538 F. Supp. 2d at 828–31; *see also* Gov't Br. at 7, 13. The Court's ruling did not "affect the theory of the case based on numerous other alleged misstatements and omissions

15

shifting and adding to its theories of the charges—"the court will permit no further 'legal theory morphs' in this case, which has been awaiting trial for several years." *Id.* at 826.

The Government's last theory of omission liability for Schiff's own statements was raised for the first time at the February 26, 2008 hearing, approximately one month before Schiff's trial was to begin. *Id.* Under this new theory, "Schiff's liability for omissions to state in the SEC filings stemmed from prior misleading statements of both [Schiff and Lane] on analyst calls, linking alleged misstatements on analyst calls to alleged omissions to state in the SEC filings as 'all of a piece.'" *Id.* The Court reiterated that "the Government cannot premise [omissions in] SEC filing[s] upon [any] misstatement[s] in [the] SEC filing[s] because it has not alleged *any misstatement[s]*" in those filings.[11] *Id.* at 827 (emphasis in original). Thus, omission

_____

to state in analyst calls." *Schiff*, 538 F. Supp. 2d at 825 (noting Schiff challenges those misstatements as "inactionable puffery" or "forward looking," and that the Court will deal with the sufficiency issues at the charge conference).

[11]To emphasize the point, the Court explained that "omission liability cannot be premised on 'falsity of reported sales and earnings' [in the SEC filings] without violating the [parties'] Stipulation." *Id.* at 829 (indicating that the "statement made" under Rule 10b-5(b) cannot be "the sales and earnings figures" because "those are accounting concepts," "leaving an omission unattached to a 'statement made'").

16

liability must be predicated on other prior statements. *Id.* In this context, the Court also remarked that the Government was not alleging a theory based on a "duty to correct." *Id.* at 831 n.10.

## II. Standard of Review

We exercise a plenary review standard over legal questions, and review factual findings for clear error. *United States v. Scott*, 223 F.3d 208, 210 (3d Cir. 2000); *see also United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000). We review a district court's decision to exclude expert testimony under an abuse-of-discretion standard. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). "An abuse of discretion arises when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact," but "to the extent that the District Court's decision involved a legal interpretation of the Federal Rules of Evidence, our review is plenary." *Id.* (internal quotations and citation omitted).

## III. Omission Liability Theories Under Rule 10b-5

A district court may grant a pretrial motion to dismiss an indictment, or a portion thereof, if the indictment's allegations do not suffice to charge an offense. *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). In this case, we treat the dismissal of legal theories proffered by the Government, and the District Court's subsequent preclusion from presenting those

17

theories at trial, as dismissal of part of the indictment. Rule 10b-5(b) is the relevant legal grounding in this appeal. It states in pertinent part: "It [is] unlawful . . . . (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]"[12]

Throughout the pretrial proceedings, and even in this appeal, the Government has engaged in a game of musical chairs with their pursuit of changing legal theories under Rule 10b-5. The District Court initially afforded the Government substantial leeway in developing and settling on its legal theories of liability. However, in the Court's Opinion it put an end to these shifting bases. It stated that it would permit "no further 'legal theory morphs'" by the Government. *See Schiff*, 538 F. Supp.

_____

[12]This Rule corresponds with § 10(b), 15 U.S.C. § 78j(b) ("manipulative and deceptive devices"), charged in the indictment:

> It shall be unlawful for any person . . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules [of the SEC] . . . in the public interest or for the protection of investors.

18

2d at 826 (internal quotations omitted).

Early on, the Government amended the indictment and entered into a Stipulation, eliminating all allegations related to misstatements in Bristol's SEC filings. Since then, its introduction of new legal theories appears designed to find creative ways to hold Schiff and Lane liable for those SEC filings. Because the Government has stipulated that there are no affirmative misstatements in the four corners of the SEC 10-Q documents, it has attempted to bring these filings back into the case against the defendants through theories of omission liability. As noted below, we conclude that the omission liability theories being appealed are either waived or not legally viable as federal crimes.

Despite this, the Government is not flying blind into Schiff's trial. As the District Court stated, and the Government acknowledged at oral argument, it can pursue directly the alleged misstatements and omissions on analyst calls under Rule 10b-5, as well as conspiracy, scheme, and aiding and abetting legal theories, against Schiff (and later Lane) at trial. *See id.* at 831.

## A. Statements of Others

The first issue we address is the viability of the Government's legal theory that Schiff had a fiduciary duty to rectify Lane's allegedly material misstatements on analyst calls

in subsequent SEC filings.[13]  If such a duty exists, then the resulting omissions in SEC filings would be actionable.  At oral argument, the Government characterized this as a "back-up theory" if Schiff contends at trial that Lane did not have the proper *mens rea* for aiding and abetting liability.  The District Court concluded that this is not a viable theory, and we agree.

Absent a duty to disclose, silence is not fraudulent or "misleading under Rule 10b-5."  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997)

---

[13]Lane's *amicus* brief argues that Schiff cannot be liable for Lane's statements because Lane's statements were not themselves actionable under the securities laws.  (Lane Br. at 38.)  Lane characterizes his statements as "historical" or "forward-looking predictions conveying Mr. Lane's optimism" about product sales to Bristol's wholesalers.  (*Id.*)  In the context of Schiff's statements (that mirrored Lane's), the District Court explicitly reserved the sufficiency question for further briefing and discussion at the charging conference.  *See Schiff*, 538 F.3d at 825 n.5 ("Schiff challenges various statements as 'inactionable puffery' and mere[ly] 'forward looking,' . . . [but] the Court here rules only on the alleged omissions in the SEC filings and the statements on analyst calls that constitute mere recitation of sales and earnings figures from the SEC filings.  The Court will reserve decision on the sufficiency of all other alleged misstatements and omissions on analyst calls until the charge conference.").

("Except for specific periodic reporting requirements[,] . . . there is no general duty on the part of a company to provide the public with all material information."). When you speak, however, and it is material, you are "bound to speak truthfully." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992). We explained in *Oran v. Stafford*[14] that a duty to disclose under Rule 10b-5 may arise in three circumstances: "when there is [1] insider trading, [2] a statute requiring disclosure, or [3] an inaccurate, incomplete or misleading prior disclosure." 226 F.3d at 285–86 (citations omitted). To support this proposition, the *Oran* Court cited to (i) a First Circuit Court of Appeals *en banc* opinion, *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990) (*en banc*), explaining that a duty to disclose arises in the same three circumstances listed in *Oran*, (ii) a Second

---

[14]*Oran* was a civil class action brought by investors against a pharmaceutical company for alleged misrepresentations and omissions regarding connection between the company's weight loss medications and information related to heart valve problems of patients using those drugs. 226 F.3d 275, 285–86 (3d Cir. 2000). Among other things, the plaintiffs argued that the company's failure to disclose the dates on which it first learned of adverse data and reports was a material omission because of the light it would have cast on the company's potential liability exposure. *Id.* at 285. The *Oran* Court concluded that none of the three circumstances to create a duty under Rule 10b-5 (*i.e.*, insider trading, statutory requirement to disclose, or misstatement) was present, and thus there was no duty to disclose the information. *Id.* at 286.

21

Circuit Court of Appeals opinion, *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992), noting that, absent the same three circumstances, there is no duty to speak, and (iii) a District of Delaware Court opinion, *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1129 (D. Del. 1988). *Oran*, 226 F.3d at 286.

The Government argues that Schiff's duty to disclose in the SEC filings derives from a general fiduciary obligation of "high corporate executives" to the company's shareholders, which it concedes is not one of the three circumstances described in *Oran*. It contends that *Oran* did not create an exhaustive list of duties in the securities context, and that this fiduciary duty qualifies as a fourth circumstance.

This argument reaches too far. It is not supported by the language of § 10(b) and Rule 10b-5, and potentially has broad implications that call into question whether the result the Government advocates for advances the ball in this complicated area.

Moreover, in *Winer Family Trust v. Queen*, we explained that the list describing the derivation of a duty to disclose in *Oran* is exclusive. 503 F.3d 319, 329 (3d Cir. 2007) ("an affirmative duty arises *only* when [one of *Oran*'s three prongs]" are triggered) (emphasis added); *see also City of Monroe v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (noting a "duty to affirmatively disclose may arise" in these same three

22

circumstances) (internal quotations omitted). The Government cites to the language in *Winer* directly preceding the list, which states that, "[a]s a general matter, an affirmative duty arises only when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading disclosure." 503 F.3d at 329. This infers, its argument continues, that the Court did not intend exclusivity. We disagree, as we do not interpret *Winer*'s prefatory language to signal a lack of exclusivity, particularly with the Court's use of the word "only." Rather, the Court used the "general matter" phrase as an introduction to its discussion of why the defendants had no disclosure duty under any of those circumstances.

The Government's legal support for its fiduciary duty theory is also weak. It cites to a Fifth Circuit Court of Appeals case, *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005), *modifying opinion on denial of rhr'g in* 397 F.3d 249 (5th Cir. 2005), and a district court case on which *Barrie* relied, *In re SmarTalk Teleservices*, 124 F. Supp. 2d 527 (D. Ohio 2000). The *Barrie* Court stated:

> Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it[,] . . . the fraud is sufficiently pleaded as to each defendant[, which] accords with common sense and the policy considerations underlying the heightened pleading requirements. . . . Accordingly, both [defendants]

23

Hammond and Graham are on fair notice of the
claims against them.

409 F.3d at 656 (*citing SmarTalk,* 124 F. Supp. 2d at 543).
*Barrie* dealt only with the heightened notice pleading standard
for fraud in a civil case under the Private Securities Litigation
Reform Act ("PSLRA," Pub. L. 104-67, 109 Stat. 737 (codified
in scattered sections of 15 U.S.C.)), concluding that sufficient
facts were pled with particularity in the complaint "to put the
alleged speakers on notice of the statements attributed to them."
*SmarTalk,* 124 F. Supp. 2d at 543. It did *not* address or discuss
the actual viability of the legal theory. It never mentioned how
or when such a duty to disclose based on statements of another
arises, or whether Rule 10b-5 contemplates a duty to speak in
such a circumstance based on fiduciary obligations (and the
Government conceded as much at oral argument). The same is
true of *SmarTalk*, 124 F. Supp. 2d at 543.[15] In fact, we could

---

[15]We found only a few other non-published cases that relied
principally on either *SmarTalk* or *Barrie* to state the same,
including *United States v. Causey*, No. H-04-025-SS, 2005 WL
3560632, at *9 (S.D. Tex. Dec. 29, 2005), which the
Government also cites in its brief. *See, e.g., McGuire v.
Dendreon Corp.*, No. 07-800, 2008 WL 5130042, at *8 (W.D.
Wash. Dec. 5, 2008) (permitting plaintiffs to amend their
complaint on this basis, but not discussing the viability of the
underlying theory); *In re InfoSonics Corp. Sec. Litig.*, No. 06-
1231, 2007 WL 2301757, at *11 (S.D. Cal. Aug. 7, 2007) (citing
*Barrie* and *SmarTalk*, indicating in a sentence that these courts

find no case that discussed or validated the legal viability of such a theory on fiduciary grounds.[16]

Moreover, such a generalized corporate fiduciary duty has few logical boundaries. What would the limiting principle

---

allowed the issue to be pled, but not engaging in any substantive discussion).

[16]Of course, we should be concerned about too narrowly tailoring the securities laws such that the offending corporate executive can subvert the law by using subordinates to make false statements. This concern, though, is alleviated substantially in the criminal context by conspiracy, scheme, and aiding and abetting liability. Furthermore, this particular scenario has been contemplated for liability under § 10(b), based on agency principles, where secondary liability (*e.g.*, aiding and abetting) is not covered by the statute. *See Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1120 (W.D. Mich. 1996) ("When a defendant controls the content of another actor's statement, the actor is essentially operating as the agent of the defendant, unlike the situation wherein a defendant provides 'substantial assistance' in aiding the actor's individual course of conduct[; yet] [t]he key to determining primary liability is that the plaintiff must allege that defendant was the original and knowing source of the misrepresentation," such that the other was a "mere conduit."); *see also Copland v. Grumet*, 88 F. Supp. 2d 326, 333 (D.N.J. 1999) (discussing theories of liability under § 10(b), including *Picard*).

be if we imposed this duty on corporations and its employees?[17]

_____

[17]In a hearing before the District Court on October 30, 2007, the Court attempted to tease out such a limiting principle in its colloquy with the Government. (App. 449–60.) For example:

> [Court:] What if [Schiff] learned about [the misstatements] the next day. What is his duty?
>
> [Court:] I'm trying to figure out where the dividing line is. Take my example of a panel discussion to a group of investors. Are they required in front of investors to have an argument back and forth where they disagree with each other and Schiff says to Lane, I don't think that's right, or Lane said to Schiff, I don't think that's right? [Government:] They're required to correct it in some way when they have the time.
>
> [Court:] How do you decide that a vice president for manufacture hasn't breached his fiduciary duty if he finds out the next day that Mr. Lane said something that he thinks is wrong? Is he supposed to call up the analyst? What's he supposed to do? Before people can be charged with a crime, they have to know what they're supposed to do. . . . [W]ere they supposed to have an argument with each other on the conference call with the analyst? Were they supposed to convene another conference call the next day?

The Government attempts to cabin this duty to an extent by characterizing it as only requiring "high corporate officers" to rectify misstatements.[18] But what company employees qualify as high corporate officers? Certainly there is a grey area involving the corporate structures of individual companies. Apparently this would require a court to engage in a fact-intensive review on a case-by-case basis, but in the criminal

> [Government:] Those are two ways of doing it.
>
> [Court:] What about if they had different titles? One was a subordinate to the superior making the statement. . . . [H]ow do you apply it to one corporate officer and not another?
>
> [Court:] Instead of being on the same conference call, Mr. Lane finds out the next day what Mr. Schiff did. He knows. Does he have an obligation to reconvene the call? [Government:] He has an obligation[.]
>
> [Court:] So this is a corporate spokesman fiduciary duty? [Government:] I think it's corporate, senior corporate officer, corporate spokesman fiduciary duty.

[18]At oral argument, the Government further tried to limit this duty to a joint presentation like the analyst calls, but this is a case-specific limitation that glosses over the broader ramifications.

27

context (and the potential exposure to civil liability) this uncertainty about who would qualify as a high corporate officer subject to this duty seems to undermine the requirement of fair notice.

Even more troubling is the question of how broadly this duty would apply. Schiff elaborates on this question in his brief:

> [A] fiduciary presumably would owe shareholders a duty "to rectify" public misstatements of others whenever they are made (on a conference call or, say, in a written report or on the internet), whoever makes them (a fellow employee or, say, a securities analyst), and however the fiduciary learns about them (by hearing them on a joint call or, say, by reading them in a newspaper).

(Schiff Br. at 53.) Moreover, for how long would this duty attach such that rectification would be required for an officer to absolve himself of this fiduciary liability? Would it be limited to the same day, a week, a month, or even one year? Would this duty potentially rope in all corporate officers based on a single misstatement by another individual, such that a case could be brought against all executives in a particular company under this theory?

These questions put into focus the vagueness of when such a duty would apply. Hence we are reticent to create this

28

type of fiduciary obligation to rectify statements of others when to do so simply "gilds the lily." There are other plausible theories of liability that could make these individuals criminally liable for their own statements and omissions and those of others. If Congress wants to add another prosecutorial enforcement tool by criminalizing the types of omissions the Government argues for under this proposed theory and also set the parameters for such violations, it can, but we will not do so in this case.

Furthermore, importing this type of fiduciary obligation into the federal securities laws also appears to encroach into conduct traditionally left to state corporation law. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472, 478–80 (1977) (Rule 10b-5 should not "bring within the Rule a wide variety of corporate conduct traditionally left to state regulation," and "[a]bsent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." "There may well be a need for uniform federal fiduciary standards to govern mergers such as that challenged in this complaint. But those standards should not be supplied by judicial extension of [section] 10(b) and Rule 10b-5 to 'cover the corporate universe.'") (citations omitted); *cf. Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 638–39 (3d Cir. 1989) (holding that "claims essentially grounded on corporate mismanagement are not cognizable under federal

29

law"); *Field v. Trump*, 850 F.2d 938, 941 (2d Cir. 1988) (affirming dismissal of Rule 10b-5 non-disclosure claims on the ground that they were "attempts to bootstrap state-law fiduciary-duty claims into a federal securities-law action").

The Government cites to a Supreme Court case, *Chiarella v. United States*, 445 U.S. 222, 232 (1980), to demonstrate that fiduciary obligations can be federalized in the securities law context. *Chiarella* involved insider trading charges against a printing company hired by a corporation to print corporate takeover bids. While the Court discussed fiduciary obligations, it did so in the context of insider trading, an entirely different situation than the one before us. *See Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988) (explaining that *Chiarella* "dealt not with injury caused by affirmative misrepresentations which affected the market price of securities, but with the analytically distinct problem of trading on undisclosed information"). Insider trading raises a duty to disclose under prong one of *Oran*. The Court explained that corporate insiders must "abstain from trading in the shares of [the] corporation until the disclosure of material information" because of "the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." *Chiarella*, 445 U.S. at 227. The insider relationship "gives rise to a duty to disclose because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of the uninformed minority stockholders.'" *Id.* at 228 (citation omitted) (alteration in original) (discussing

30

insider trading when "corporate insiders used undisclosed information for their own benefit").

To the extent the Government argues an alternative theory that this duty to disclose based on statements of another rests not on fiduciary grounds, but instead based on prong three of *Oran* (misstatements), waiver is an issue.[19]  During pretrial proceedings, the Government premised its duty to rectify statements of another theory solely on fiduciary duty, which is outside *Oran*.  And the Government acknowledged as much at oral argument.  For example,[20] at a hearing on June 26, 2007, the District Court pointedly asked the Government what the source of the duty was for another's misstatements other than aiding and abetting.  The Government responded: "The fiduciary duty not to mislead the public on those calls."  (App. 266–68.)  A

[19]More generally, the Government contests the District Court Opinion's description of the case's procedural posture, specifically related to when and whether certain legal theories were presented.  On our own review of the pretrial record, however, we conclude that the Court did not err in its characterization of the record, of which it was intimately familiar over years of pretrial litigation.

[20]These examples concern the Government's argument that Lane had a duty to rectify Schiff's misstatements.  The Government did not argue the opposite, that Schiff had a duty to rectify Lane's misstatements, on the same grounds, until the February 26, 2008 hearing.

31

written submission by the Government on August 3, 2007, regarding the legal basis for a duty to disclose based on statements of another, discusses *only* a fiduciary basis. (*Id.* at 405–09.) At a hearing on October 30, 2007, the Court summarized the Government's argument as "the *Oran* list of three factors is non-exclusive, and that Lane's duty to disclose arises from a fourth factor [beyond *Oran*], to wit, his fiduciary duty to shareholders," and the Government answered "yes." (*Amicus* Supp'l App. 46.) At that same hearing, the Government stated "that the third prong of [*Oran*], in fact all the prongs of [it,] deal with the duty to disclose, duties to disclose regarding *one's own statements*, and that is the basis on which it was cited in our brief." (App. 474 (emphasis added).) The Court clarified that "in the section of the brief on [Lane's] actual statements, something he uttered, you cite [*Oran*]." (*Id.* at 474–75.) To which the Government responded: "That's correct." (*Id.* at 475.) The Court continued, noting that "on the section of the brief dealing with his omissions to state when Mr. Schiff said something, there is *only* this fiduciary duty there." (*Id.* (emphasis added).) The Government again responded: "That's right." (*Id.*)

Based on this record, we conclude that an argument grounded in *Oran* was waived and precluded by the District Court's case management ruling in the Opinion.[21] *Cf. United*

---

[21]"[D]istrict courts have wide discretion in the management of their cases." *United States v. Wecht*, 484 F.3d 194, 217 (3d

32

*States v. Dell'Aquilla*, 150 F.3d 329, 335 (3d Cir. 1998) (explaining that appellants contended that they raised specific arguments before the district court, but the appeals panel could find no support in the record for those assertions and determined the issues were waived, noting that "absent exceptional circumstances, an issue not raised in district court will not be heard on appeal").

Despite this waiver, the plain language of § 10(b) and corresponding Rule 10b-5 do not contemplate the general failure to rectify misstatements of others. *See, e.g.*, *SEC v. Tambone*, --- F.3d ----, 2010 WL 796996, at *9 (1st Cir. 2010) (*en banc*) ("Reading 'make' to include the use of a false statement by one other than the maker would extend primary liability beyond the scope of conduct prohibited by the text of Rule 10b-5(b)."); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("[A] secondary actor cannot incur primary liability under [§ 10(b)] for a statement not attributed to that actor at the time of its dissemination."); *Shapiro*, 123 F.3d at 720 ("[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how

Cir. 2007); *see also Yakowicz v. Pennsylvania,* 683 F.2d 778, 784 (3d Cir. 1982) (referring to the "broad powers with respect to timing and other considerations that [the District Court] has generally in the management of the cases before it as they proceed through the various stages before and during trial").

33

substantial that aid may be, it is not enough to trigger liability under Section 10(b)."); *see also In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 504 (W.D. Pa. 2002) (relying on the text of Rule 10b-5(b) to conclude that a defendant that "was not the maker of the . . . statements . . . cannot be responsible for omissions in statements that it itself did not make"); *Wafra Leasing Corp. v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 867 (N.D. Ill. 2002) (explaining that 10b-5(b)'s text "demonstrates that a defendant is liable only for those omissions that make his *own* statements misleading") (emphasis in original)). Moreover, in *Central Bank*, the Supreme Court determined that the scope of § 10(b) does not encompass aiding and abetting liability because the statute "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). Consequently, incorporating into the statute an obligation to rectify others' misstatements (though lacking even the aiding and abetting *mens rea* requirement of the initial statement made) would be illogical in light of the Supreme Court's holding.

The Rule's plain language presents two bases for liability: (1) "[t]o make any untrue statement" *or* (2) "to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b); *see also Burlington*, 114 F.3d at 1431 (stating that "a Section 10(b) plaintiff ordinarily is required to identify a specific statement made by the company and then explain either (1) how the

34

statement was materially misleading or (2) how it omitted a fact that made the statement materially misleading"); *Goldwater v. Alston & Bird*, 116 F.R.D. 342, 348 (N.D. Ill. 1987) (indicating two distinct bases for liability under Rule 10b-5(b)—misrepresentations and misleading statements).

Schiff argues that the Government's contention that he "actually made the omissions" by not rectifying Lane's purported misstatements conflates the two independent grounds. We agree. Schiff did not make those statements, Lane did (and vice versa). The Government responds that we should interpret the securities laws broadly. However, "generalized references to the remedial purposes of the securities laws will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit." *Aaron v. SEC*, 446 U.S. 680, 695 (1980) (internal quotations and citations omitted).

## B.    Schiff's Own Statements

Turning from Schiff's liability for statements of another to his own statements, we must address three of the Government's omission liability theories: (1) "all of a piece"; (2) duty to update; and (3) duty to correct. Like the omission theories premised on statements of another, these theories similarly fail. Generally, the Government alleges that Schiff made material misstatements in the quarterly analyst calls and failed thereafter to update or correct these statements in the Management Disclosure and Analysis section of Bristol's SEC

10-Q filings (filed quarterly, approximately one month after each call) or 10-K annual report. (Gov't Br. at 7.) We note preliminarily, however, that Schiff's direct liability under Rule 10b-5(b) for his alleged misstatements and omissions on analyst calls is not premised on an omission liability theory pinned to the SEC filings, and thus remains in the case. This issue is not contested on appeal and falls under prong three of *Oran* as "an inaccurate, incomplete or misleading prior disclosure." *Oran*, 226 F.3d at 285–86.

## 1. "All of a Piece"

The District Court dismissed the "all of a piece" theory in its Opinion. It stated that the first time this theory was raised was at the February 26, 2008 hearing. At that hearing, the Government argued that the quarterly analyst calls and SEC 10-Q filings were tied together as essentially one event, such that the intentional misstatements on analyst calls created a duty of disclosure in the SEC filings under Rule 10b-5(b) to "make the statements in the prior analyst calls not misleading." *Schiff*, 538 F. Supp. 2d at 827, 829 (noting that "[t]his theory attempts to fit omission liability into *Oran*'s third prong"). However, because the Government has stipulated that Schiff is not charged with affirmative misstatements in the SEC filings, the alleged omissions are not tied to any purported misleading statements in those filings, as is required by Rule 10b-5(b). 17 C.F.R. § 240.10b-5(b) ("to omit to state a material fact necessary in order to make the statements made, *in light of the circumstances*

36

*under which they were made*, not misleading") (emphasis added). Thus, we agree with and incorporate the District Court's well-reasoned analysis dismissing this theory. *See Schiff*, 538 F. Supp. 2d at 829–31.

The Court characterized the issue as "the fair breadth of context between a prior misleading statement in one context (analyst conference call) and the alleged omission 'necessary' to make that earlier 'statement' not misleading." *Id.* at 829. It indicated that it is not logical "to charge as a crime that an utterance in an analyst conference call must have other words written in a later SEC filing in order to make the utterance in the prior phone call 'not misleading'" because under Rule 10b-5 the "duty to disclose . . . arises when each statement was made." *Id.* at 830. The "breadth of context between the alleged false statement on an analyst [call] and alleged omission in the [SEC] filings is too broad." *Id.* (determining there was not a sufficient nexus to tie the analyst calls and the SEC 10-Q filings together under Rule 10b-5(b)'s language). Thus, there are no actionable omissions in the SEC filings on which to base this theory.

## 2.     Duties to Update & Correct

The threshold question here is whether the duty to update and correct theories were waived or precluded by the District Court's case management ruling in the Opinion regarding new legal theories. *Id*. at 826. The Court also explicitly stated in the Opinion that the "Government is *not* alleging here a 'duty to

37

correct' . . . . That theory is inapposite here because the Government has alleged that [Schiff's] statements on the analyst calls were misleading at the time made." *See id.* at 831 n.10 (emphasis added). Moreover, based on our review of the record, the Government's only allegations against Schiff are for intentional misstatements or omissions charged in the indictment, alleged in the Government's Bill of Particulars, and maintained by the Government throughout the pretrial proceedings.[22] By attempting to shoehorn these new theories into the case (which the Government characterizes as defensive theories), it appears to be trying to amend constructively the indictment at the eleventh hour. *See United States v. Henry*, 29

---

[22]For example, at the February 26, 2008 hearing, the Government maintained to the Court that "Schiff lied on analyst calls in direct response to questions by analysts" regarding "the amount of excess inventory," and "on the analyst call again Mr. Schiff lies . . . . Following [the] analyst call, again Mr. Schiff lies." (App. 826, 828.) The Court summarized that "[y]our basic case has always been, and remains to this day, that Mr. Schiff did not tell the truth on conference calls with analysts about the effect of the excess inventory buildup." The Government agreed. (App. 1135.) Significantly, Schiff's counsel sent a letter to the Court on March 3, 2008 confirming that "the [G]overnment has not based its theory on a 'duty to correct,'" which would have been "inapposite here because the government has alleged that Mr. Schiff knew that the statements on the analyst calls were misleading at the time they were made." (App. 874 n.5.)

F.3d 112, 114 (3d Cir. 1994) (indicating "theories [that] were not advanced in the indictment [] cannot save it on appeal"); *see also United States v. Alkaabi*, 223 F. Supp. 2d 583, 588–89 (D.N.J. 2002) (rejecting the government's attempt to "usurp the role of the grand jury by advancing new, unalleged theories . . . in its briefs in an effort to save the Indictments"; "[t]he Government did not include its three alternative property theories in the Indictments presented to the Grand Jury, and it cannot do so now").

The Government counters by pointing to an August 3, 2007 letter brief to the District Court that briefly referenced the duty to correct concerning Lane (though it did not refer to omissions in SEC filings), and argues that it adopted the arguments for Schiff. But we do not see confirmation of this in the record.[23] Moreover, "the [D]istrict [C]ourt was in the best position to determine whether or not the issue . . . was raised." *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 568 (7th Cir. 2006). Thus, we agree with Schiff that these

---

[23]In fact, the Government's other record cites support its "all of a piece theory," and not the duties to update or correct. To reiterate, this theory goes that Schiff intentionally "lies" (makes false or misleading statements, including omissions) on analyst calls, but could nevertheless potentially be vindicated in whole or part by correcting those misstatements in subsequent SEC filings. (App. 827–29 (Government's statements at February 26, 2008 hearing).)

theories were waived or precluded by the District Court's case management ruling in the Opinion.

In *Burlington*, 114 F.3d at 1430–34, we discussed the duties to update and correct. In the civil context, which applies here to understand when these duties arise, we stated that "the duties to update and correct are two other avenues of finding a duty to disclose that have been kicked around by courts, litigants and academics alike." *Id.* at 1430 (internal quotations and citations omitted). *See generally* Robert H. Rosenblum, *An Issuer's Duty Under Rule 10b-5 to Correct and Update Materially Misleading Statements*, 40 Cath. U. L. Rev. 289 (1991). These disclosure duties fit within prong three of *Oran*. *Oran*, 226 F.3d at 286.

Even if the duty to update were not waived by the Government, this new theory would not survive a motion to dismiss in this case. A duty to update arises when "statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." *Burlington*, 114 F.3d at 1431 (*citing Greenfield v. Heublein, Inc.*, 742 F.2d 751, 758 (3d Cir. 1984) (explaining that updating might be required if a prior disclosure "[had] become materially misleading in light of subsequent events")). The initial statement that was "reasonable at the time made" must contain "an implicit factual representation that remained 'alive' in the minds of investors as a continuing representation." *Id.* at 1432 (citations omitted). This is a narrow duty because of the

potential to create a sweeping continuing obligation for corporations when they disclose information. *Id.* at 1433–34 (explaining the benefits of encouraging voluntary "maximal disclosure" of corporate "information useful to investors," such as internal company forecasts, and disincentivizing corporations from remaining silent and releasing less information in the hope of avoiding the attachment of a continuing obligation to monitor and update all released information). Importantly, the *Burlington* Court noted that the duty has only been plausible in cases where the initial statement concerns "*fundamental*[] change[s]" in the nature of the company—such as a merger, liquidation, or takeover attempt—and when subsequent events produce an "*extreme*" or "radical change" in the continuing validity of that initial statement. *Id.* at 1433–34 & n.20 (refusing to find a duty to update an earnings forecast that, although reasonable when made, may turn out to have been wrong in hindsight, and "reemphasiz[ing] that the . . . two cases in which we recognized that a duty to update might exist[] were vastly different" and the update claims eventually were rejected); *id.* at 1434 n.20 (comparing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 745 (7th Cir. 1997) (suggesting that even such a narrow duty might not exist)). The circumstances in this case, concerning Bristol's ongoing sales volume of pharmaceutical products to wholesalers in its distribution chain, do not come close to fitting within the narrow range of this duty.

The duty to correct is similarly unsuccessful, but it is at least less far afield than the duty to update. The duty to correct

41

arises when "a company makes a *historical statement* that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *Burlington*, 114 F.3d at 1431 (internal citations and quotations omitted) (noting that the duty "can also apply to a certain narrow set of forward-looking statements"). The key for this duty to exist is a triggering factual event after the statement is made. We ask what the event would be that gives rise to the duty to correct. Here, nearly three years have passed since the Government presented the current indictment to the grand jury, and it has failed to make any allegation or suggestion (including in its appellate arguments) as to what the subsequent event would be to trigger this duty. *See id.* at 1432. We also cannot imagine what that event would be.[24] The defendants need to have some notice of this fundamental factual predicate to be able to prepare an adequate defense to the criminal charges.

---

[24]Additionally, we question why the correction must be made in the SEC 10-Q filings, as the Government argues. Scholars have commented that if a duty to correct or update is triggered, it should be corrected in a timely fashion and preferably by using the same medium through which the initial error was disseminated, which in this case would have been a follow-up analyst call. *See, e.g.*, Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 5:328, at 5-542 (2d ed. 2007) ("[A] press release will normally be corrected by a press release. . . . An ad in a major newspaper would normally be corrected by an ad or announcement in that same paper.") (collecting cases).

### III. *Daubert* Materiality Ruling

At Schiff's trial, the Government must prove materiality as an element of a Rule 10b-5(b) violation.[25] *Basic v. Levinson*, 485 U.S. 224, 238 (1988). "Material information is 'information that would be important to a reasonable investor in making his or her investment decision.'" *Oran*, 226 F.3d at 282 (*quoting Burlington*, 114 F.3d at 1425). This "is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n.11 (3d Cir. 1992) (*citing TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

The Government sought to introduce the drop in Bristol's stock price in the days following the company's three pertinent announcements on April 1, 3, and 25 (corresponding with the company's stock drops on April 2, 4, and 26, respectively) as evidence of materiality of the alleged misstatements and omissions involving the concealment of wholesaler inventory levels. Though this is not the only method of proving

---

[25]Criminal and civil securities fraud pursuant to Rule 10b-5(b) requires that the defendant "made a *materially* false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." 17 C.F.R. § 240.10b-5(b) (emphasis added); *see Burlington*, 114 F.3d at 1417.

materiality,[26] it is widely used as evidence if the market is efficient (and there is no question here about whether the market is efficient). *See Oran*, 226 F.3d at 282 (*quoting Burlington*, 114 F.3d at 1425) (explaining that an "efficient market" "'immediately incorporate[s]'" "'information important to reasonable investors'" and the Third Circuit is committed to the efficient market hypothesis). We have explained that the "creation of the stock-price rule was explicitly to determine whether information was material." *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005) (*citing Burlington*, 114 F.3d at 1425). To use stock price drops as evidence of materiality, the Government "must demonstrate that public disclosure of the misstatements charged in the indictment had an 'appreciable negative effect' on the stock price." *Schiff*, 538 F. Supp. 2d at 835 (*quoting Oran*, 226 F.3d at 282–83 (noting that

---

[26]While stock drop evidence is generally accepted, other evidentiary methods could be effective before a jury as well, particularly if additional factors unrelated to the charged fraud muddy the stock drop evidence. For example, the actionable statements pertinent to this appeal occurred in analyst calls with Wall Street investment bankers. The Government has other fact witnesses for materiality, including Wall Street analysts and Bristol employees. (Gov't Br. at 59.) Presumably, those witnesses would testify that a pharmaceutical company's sales and the level of wholesaler inventory are material to their investment decisions and forecasts, and were so in this case. Moreover, analyst and company reports discussing inventory levels are themselves probative of this issue.

"the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclose, of the price of the firm's stock")).

Before the District Court there was a question of whether the Government needed an expert to present the stock drop evidence, and it was determined that the introduction of this evidence would proceed through expert testimony.[27] (*See* App. 600–05.) The District Court noted that "[c]ourts often turn to economic experts to determine whether a particular announcement had an appreciable effect on the stock price." *Schiff*, 538 F. Supp. 2d at 835 (*citing Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005) ("Demonstrating that market reactions are caused by company press releases should not, however, be an exercise in *post hoc*, *propter hoc* logic. Many variables have the potential to and do affect a stock price—the daily market average; national, local and industry-specific economic news; competitors' activities; and on and on. The overall volatility of the stock price and the speed of its reaction to company news may also be significant. To this end, expert testimony may be helpful because of the utility of statistical event analysis for this inquiry.")); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) ("[A] lower [share] price may reflect, not . . . earlier misrepresentation[s], but changed

---

[27]The Government is not appealing the requirement of an expert to testify about the stock price drop evidence in the first instance.

economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.").

We evaluate a district court's decision to exclude expert testimony under Rule 702 of the Federal Rules of Evidence.[28] We have explained that "Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [, *i.e.*, reliability]; and (3) the expert's testimony must assist the trier of fact [, *i.e.*, fit]." *Pineda*, 520 F.3d at 244. "Under the Federal Rules of Evidence, a trial judge acts as a gatekeeper to ensure that any

---

[28]Federal Rule of Evidence 702, amended in 2000 in response to *Daubert*, reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

and all expert testimony or evidence is not only relevant, but also reliable." *Id.* at 243 (internal quotations and citations omitted). Before the proposed testimony gets presented to the jury, the trial judge evaluates its admissibility based on these three requirements.

The third requirement is at issue here. It is typically understood in terms of whether there is a sufficient "fit" between the expert's testimony and the facts that the jury is being asked to consider. *Daubert*, 509 U.S. at 591. In assessing whether an expert's proposed testimony "fits," we are asking "'whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Id.* (*quoting United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Put another way, this is a question of relevance, and "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility" if it has the "potential for assisting the trier of fact." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (*citing Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996)); *see also In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999) ("expert evidence which does not relate to an issue in the case is not helpful"). The "standard is not that high," but "is higher than bare relevance." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

In its Opinion, the District Court preliminarily excluded the Government's stock drop materiality expert based on the

lack of fit. The Court left open, however, the possibility of introducing this evidence at trial if the Government provided a sufficient factual foundation that would remedy this gap in the expert's testimony. *See Schiff*, 538 F. Supp. 2d at 842 n.24. We believe the Court did not abuse its discretion.

The procedural history and the Court's discussion of this expert issue in its Opinion are complex. The Court left no stone unturned in its comprehensive discussion. Rather than present a long recitation, we go directly to the heart of the issue.

The Government's stock drop expert, Dr. Paul Wazzan, presented a report that addressed Bristol's three key April 2002 "curative announcements" and corresponding stock price drop dates. At the beginning of the *Daubert* hearing, and before Dr. Wazzan took the stand, the Government restricted his testimony to only one date, April 4, which concerned Bristol's April 3 announcements (press release and analyst call). Dr. Wazzan's report and his testimony made clear that, in conducting an event study, he was only asked to deal with exogenous events beyond the company's announcement (*i.e.*, events outside the company's control, such as market, industry, and economy-wide effects).[29]

---

[29]An event study, such as the one Dr. Wazzan performed, "is a statistical regression analysis that examines the effect of an event on a depend[e]nt variable, such as a corporation's stock price." *In re Apollo Group Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844 (D. Ariz. 2007) (internal quotations and citation omitted)

The Government did not ask him to address the potentially unrelated negative events disclosed in Bristol's announcement by statistically disaggregating the effects of those events.[30]

---

(noting that it is the tool "most often used by experts to isolate the economic losses caused by the alleged fraud").

[30]Dr. Wazzan opined in his report that Bristol's announcements on April 1, 3, and 25 "caused statistically significant changes to [Bristol's] stock price," *Schiff*, 538 F. Supp. 2d at 837, though at the *Daubert* hearing the Government limited this report to only April 3. The District Court explained that

> Dr. Wazzan performed an event study and also examined the stock price drops after controlling for exogenous market, industry, and economy-wide effects. Thus, he concluded that the announcements had material, measurable and statistically significant impacts. He did not, however, attempt to control for the multiple simultaneous adverse [Bristol] news that included both events charged in the indictment and events not charged in the indictment.

*Id.* The April 3 disclosed events included the quantification of workdown of the wholesalers' excess inventory and short-term demand, Lane's termination, and other long-term demand projections, including an analysis on the effect of generic drug introduction on specific Bristol products (loss of exclusivity).

49

At the end of the hearing, the Court engaged the Government in a colloquy on this issue. The Court questioned whether there was an analytical gap in the expert's testimony, such that it did not "fit" the issue of materiality. Its concerns were two-fold (and were elaborated on in its Opinion, see *Schiff*, 538 F. Supp. 2d at 835–42).[31] First, it addressed the apparent

---

[31]Schiff's stock drop materiality expert, Dr. R. Glen Hubbard, addressed in his report both issues the Court raised as analytical concerns in Dr. Wazzan's report. For example, Dr. Hubbard opined that "the observed stock price decline on April [4] could be explained as a response to disappointing consumer demand for prescriptions, management changes, and/or . . . announcements concerning [Bristol's] credit, rather than a reaction to the wholesaler inventory workdown plan." (App. 763.)

Schiff argues that Dr. Wazzan's report is unreliable because it is based on a flawed methodology. According to Dr. Hubbard, an event study "cannot reliably disentangle" unrelated events and new news. (App. 761–65.) The Government's position, however, is that, in the April 3 announcements, all disclosed events are related and the company disclosed new information regarding wholesaler inventories. Moreover, "[a] judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusion inaccurate." *Paoli*, 35 F.3d at 744–45. Based on this, we do not view the event study as an impermissible methodology under the reliability factors mentioned in *Daubert*, 509 U.S. at 594–95, or *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (setting forth an

confounding negative events within Bristol's disclosures. If a company event unrelated to the wholesaler inventory issue, but simultaneously announced, triggered the stock drop, then the expert's testimony that viewed the announcement as a whole would not be probative of materiality (*i.e.*, it would fail to fit). Dr. Wazzan testified that he could have statistically disaggregated multiple confounding factors (*i.e.*, simultaneously disclosed unrelated negative events), but the Government did not ask him to do so.

Second, because the Government confined the expert's report to one day, the Court raised a potential issue arising from *Merck*, 432 F.3d at 269, that was not addressed in Dr. Wazzan's report. *See Schiff*, 538 F. Supp. 2d at 839 (explaining that "if any portion of the April 3, 2002 disclosure is essentially a redisclosure of the same information disclosed on April 1, such redisclosure may not necessarily be the cause of any of the stock price drop observed on April 4"). The *Merck* court explained that, in an "efficient market[,]" "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." 432 F.3d at 269 & n.5 (internal quotations and citation omitted) (stating that the stock price effect "occurs in the period immediately following the disclosure" (internal quotations and citation omitted)). Thus, if similar information is disclosed to the market on multiple days, and there is not appreciable movement in the stock price after

_____

eight-part test for determining reliability).

51

the initial disclosure, then a stock price drop following the secondary disclosure would not be attributable to that event, but some other factor. *Id*. at 269 (indicating that "Merck's stock did not drop after the first disclosure, and that is generally when we measure the materiality of the disclosure, not [the subsequent disclosure]").

By restricting Dr. Wazzan's report and testimony to only the April 3 announcements and April 4 stock drop, he did not consider what inventory information announced on April 3 was new and what was already disclosed (and thereby already incorporated into the market price of Bristol's stock).[32]  And if

---

[32]To elaborate on the District Court's *Merck* concerns, we note that Bristol's issuance of its 10-K on April 1, which was initially a part of Dr. Wazzan's report but excluded by the Government at the *Daubert* hearing, appears to have included not only negative disclosures related to the inventory issue, but also other unrelated events, such as the adverse outcome of a patent case that cost the company millions of dollars. Like the analysis of the April 3 announcements and the subsequent April 4 stock price drop, it is not clear that the inventory issue disclosed on April 1 had an appreciable effect on the April 2 stock price drop. Dr. Wazzan's testimony concerning only April 3 and 4 does not shed light on this issue.

Moreover, part of Schiff's materiality stock drop defense relies on *Merck*—that the alleged misstatements concerning inventory issues were not material because that information was already available to the market in the period before all the April

there were a prior disclosure, his restricted testimony did not look back and opine on the materiality of that initial disclosure. If no new information related to the inventory issue were disclosed on April 3, then the stock drop on April 4 might not be attributable to that issue, but instead to the company's other disclosed negative events.

The Government maintained, however, that all the negative company events disclosed in Bristol's April 3 announcements were new and related to the inventory issue; thus statistical disaggregation of those events by the expert was unnecessary. It responded to the Court's concern regarding fit by stating that at trial it intended to present fact witnesses to testify to relatedness and lay the foundation for Dr. Wazzan's report and testimony, which only viewed the announcements as a whole. Those witnesses would substantiate that all the events in the announcement related to the inventory issue.

The Court noted that the Government's mention of fact witnesses at the conclusion of the *Daubert* hearing was the first time it raised that these types of witnesses would be presented

2002 disclosures, and made no statistically significant change to the stock price. Thus the drops in April must have been due to other unrelated events.

in conjunction with the expert testimony.[33]  It also pointed out that Dr. Wazzan did not include in his report that he was relying on the assumption that all the events disclosed in the announcements were related.[34]  The Court characterized this as a "theory shift" for case management purposes, and preliminarily excluded the expert testimony and stock drop evidence.  *See Schiff*, 538 F. Supp. 2d at 840 & n.20.  At such a late date, it was concerned with fair notice and Schiff's inability to evaluate this skeletal factual proffer.  *Id.* at 841.  It was also

---

[33]The Court pointed out that the parties produced extensive briefing in the eight months leading up to the *Daubert* hearing and that the Government's position was that it "d[id] not intend to prove that Defendant Schiff's conduct, when announced, caused the stock price drop." *Schiff*, 538 F. Supp. 2d at 838 (citing the Government's brief heading: "The Cause of [Bristol's] Stock Decline Is Not At Issue").  Prior to the hearing and the factual proffer, the Government "consistently argued the exact *opposite*[,] . . . that unrelated events do not matter in proving materiality."  *Id.* at 840 n.20 (emphasis in original).  The Court noted that "[t]his argument fundamentally misses the most basic logic for stock price drop evidence to be relevant in the first place."  *Id.* at 838.

[34]The District Court determined that the Government's late presentation also violated Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, which mandates written notice of "any testimony that the government intends to use under [Federal Rules of Evidence] 702, 703, or 705." *Schiff*, 538 F. Supp. 2d at 841 (internal quotations and citation omitted).

skeptical that the fact testimony offered by the Government was not more appropriate for an expert, but did not have the opportunity to evaluate the issue. *Id.* Moreover, it suggested that, at least facially, some of the disclosed negative events in the announcement appeared significant and unrelated to the inventory issue (and hence unrelated to actionable statements in the indictment).[35] *Id.* at 840 (noting that it is "certainly not clear from the face of the April 3 press release and conference call, which clearly separated short term excess inventory work down from a long term drop in demand for certain drugs," that those events were related).

Nonetheless, in crafting its ruling in the Opinion the Court left the Government with a substantial opening for the introduction of the stock price drop evidence. It stated:

> If, during the trial, the Government believes that it has adduced sufficient factual support for its argument that all of the disclosures on April 3, 2002 are attributable to Defendant Schiff's

---

[35]The Government argues that the District Court abused its discretion by improperly finding facts, rather than leave the questions of relatedness and new news to the jury. That is not a proper characterization. The Court dealt with the issue of fit in discussing the Government's factual proffer. By letting the Government introduce its fact witnesses at trial, the Court left the fact finding to the jury.

charged conduct, the Government may make an application at that time to admit stock price drop evidence related only to the April 3, 2002 disclosure. In such a factual setting, the Court and Defendant Schiff will have heard the factual evidence to determine if indeed there are not confounding factors that require an expert.

*Id.* at 842 n.24. If the Government's reapplication at trial to admit the stock drop evidence is unsuccessful, then Dr. Wazzan's testimony would be "admissible only to refute an argument, if one is made, that the market for [Bristol's] stock is not efficient or that extrinsic market factors account for the observed stock price drop." *Id.* at 839.

We give a district court broad discretion in its rulings concerning case management both before and during trial. *See Yakowicz,* 683 F.2d at 784; *Wecht*, 484 F.3d at 217; *Titus v. Mercedes Benz of North Am.,* 695 F.2d 746, 751 (3d Cir. 1982). Here, the Court was concerned with the Government's late factual proffer (the Court issued a case management ruling that the expert reports were "final" with no opportunity to amend (App. 616, 680–81)), and that Schiff had no notice or opportunity to test such a proffer in conjunction with the admissibility of the expert's testimony. *See Schiff*, 538 F. Supp. 2d at 840–41 ("There is just no excuse for waiting until the eve of trial (and the end of the *Daubert* hearing) to launch a new theory (especially one that requires a new factual proffer)," and

the "Government's new theory has never been briefed."). The Government also appears to acknowledge that the *Daubert* "fit" requirement is contingent on the presentation of its fact witnesses to lay the foundation that the simultaneously disclosed negative events in the April 3 announcement were related to the inventory issue and thus connected to alleged statements in the indictment. (*See, e.g.*, Gov't Br. at 72.)

Accordingly, we believe the Court's thoroughly explained ruling that allows the Government to present its fact witnesses at trial, and then petition the Court for introduction of Dr. Wazzan's stock price drop testimony, was a pragmatic solution and not an abuse of discretion. *See United States v. Ford*, 481 F.3d 215, 220 n.6 (3d Cir. 2007) (agreeing with the proposition that expert testimony needs to "speak[] clearly and directly to an issue in dispute in the case, and . . . not mislead the jury," so that "district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of *Daubert*" (internal quotations and citation omitted)). The Court explained that Dr. Wazzan's testimony, as it stands, only allows him "to opine [ ] that *something* in the April 3, 2002 disclosure is material," *Schiff*, 538 F. Supp. 2d at 839 (emphasis in original), allowing the jury only to "speculate" as to the causes of the stock price drop, *id.* at 836 n.16.

If the witnesses fail to provide the proper evidentiary foundation—and the Court could not evaluate that prior to or at

57

the *Daubert* hearing because the Government only offered a bare-bones proffer, as it did not identify the witnesses or describe their testimony (and perhaps the Government's proposed witnesses will not appear at trial or will fail to confirm relatedness)—then the expert's testimony was properly excluded based on fit. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146–47 (1997) (stating that a district "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

If the Government lays this foundation (which it claims it will), at that time it can make a renewed application to the Court to present the stock price drop on April 4 through Dr. Wazzan as evidence of materiality. And given the generous view of the Federal Rules of Evidence toward admissibility, it may not be inappropriate at that stage to grant the Government's request. Schiff will likewise have an opportunity to present his own stock price drop expert, and cross-examine both the Government's foundation witnesses and Dr. Wazzan on these issues (including the concerns regarding related events and the question of disclosure of new news). *See Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

\*　\*　\*　\*　\*

58

In this context, we affirm the District Court's dismissal of the Government's omission liability theories—including fiduciary duty, all of a piece, and the duties to update and correct—and its ruling concerning the introduction of the Government's materiality expert on stock price drop evidence.